## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## ALBANY DIVISION

| | | |
|---|---|---|
| **MARY JONES WRIGHT, individually and on behalf of all others similarly situated,** | ) ) ) | |
| | ) | **CASE NO.: 1:23-CV-00027-LAG** |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | |
| **DOLLAR GENERAL CORPORATION,** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **Defendant.** | ) ) | |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Mary Jones Wright ("Plaintiff"), individually and on behalf of all others similarly situated, by and through her undersigned counsel, brings this First Amended Class Action Complaint against Defendant Dollar General Corporation ("Dollar General") for its negligent, reckless, and/or intentional practice of selling products that are, were or may have been adulterated or contaminated by virtue of rodent infestation and other unsanitary conditions in retail stores throughout Georgia and the United States. Plaintiff seeks both injunctive and monetary relief on behalf of the proposed Class and Subclass, as defined herein, (collectively, "Class" or "Classes"), including requiring full and accurate disclosure of the rodent infestation and other unsanitary conditions, recalling adulterated products as well as restoring

monies to the members of the proposed Class. Plaintiff alleges the following based upon personal knowledge, investigation by counsel, and facts that are a matter of public record and, as to all other matters, upon information and belief:

## I.    INTRODUCTION

1.    Dollar General Corporation is a Fortune 500 company and a leading operator of discount variety stores in North America. Dollar General is the largest retailer in the United States by store count, with more than 18,000 stores, located within five miles of approximately 75% of the U.S. population.[1] As of February 25, 2022, Dollar General operated 18,190 retail locations in 47 states throughout the United States, including 1,022 stores in Georgia.[2]  In the fiscal year of 2021, Dollar General's net sales amounted to approximately 34.22 billion U.S. dollars.[3] Dollar General's largest merchandise category is consumables, accounting for over 75% of their net sales, which include health, personal care, and beauty products, paper and cleaning products, packaged foods, perishables, snacks, pet and tobacco products.[4]

2.    Dollar General is a "value store" that sells groceries, over-the-counter ("OTC") medicines, medical devices, dietary supplements, cosmetics, and many

---

[1] Dollar General 2021 Annual Report, available at
https://investor.dollargeneral.com/download/companies/dollargeneral/Annual%20Reports/Final%20pdf%202021%20annual%20report.pdf https://www.statista.com/statistics/1121086/number-of-dollar-general-stores-in-the-united-states-by-state/ (last visited September 27, 2022).
[2] *Id.*
[3] *Id.*
[4] *Id.*

other household goods. Thousands of Georgia consumers and millions of Americans depend upon Dollar General for their daily needs. Dollar General's core customers are low- and fixed-income households. Over 80% of its items are priced at or below $5.00.

3.      According to Dollar General: "Dollar General stands for convenience, quality brands and low prices. Dollar General's stores aim to make shopping a hassle-free experience. We design small, neighborhood stores with carefully edited merchandise assortments to make shopping simpler. Dollar General saves time by staying focused on household essentials including paper and cleaning products, foods, over-the-counter medicines, health and beauty products, seasonal items, baby needs and more."[5] Many stores are located in rural areas, usually in small towns, often within walking distance or a very short drive from consumers' homes.

4.      Dollar General operates 28 distribution centers across the country to support its retail stores. According to Dollar General, "Well-stocked aisles and *products in perfect shape* are key to our success. Every day, tens of thousands of items make it to stores all over the country—all thanks to the dedicated work of our distribution center teams. In addition to our 18 state-of-the-art facilities around the country, we have added 10 Fresh distribution centers that allow us to deliver fresh

_____

[5] Dollar General, *About Dollar General,* available at https://dollargeneral.com/about-us (last visited August 15, 2022).

foods such as milk, eggs, and more to our stores across the country."[6] (emphasis added). One of those distribution centers for Georgia and other stores throughout the United States is located at 4101 Lakeshore Parkway in Bessemer, Alabama (the "Bessemer Distribution Center"). The Bessemer Distribution Center distributes products to Dollar General stores in Georgia and other states, including over 1,022 stores in Georgia.

5.    In or around late July or early August 2022, Dollar General closed the Bessemer Distribution Center due to significant rodent infestation.

6.    The closure of the Bessemer Distribution Center came after several Dollar General employees voiced concerns about rodents being present inside the facility, including rodents in and on retail merchandise.

7.    An individual under the name "CollegevilleGQ" on Facebook posted three separate videos of rats in food inventory and dead in the facility during his employment at the Bessemer Distribution Center. The videos were uploaded on February 23 and 25, 2022.

8.    On August 8, 2022, Birmingham news station CBS42/WIAT ran a news story about the Bessemer Distribution Center closure and the rodent/infestation concerns at the Bessemer Distribution Center.[7]

---

[6] Dollar General, *Distribution Centers*, available at https://careers.dollargeneral.com/distribution-centers/ (last visited September 27, 2022).

[7] www.cbs42.com/news/local/bessemer-dollar-general-distribution-center-temporarily-closed-due-to-possible-rat-infestation/

9.     The rodent infestation and unsanitary conditions were never disclosed to Dollar General consumers prior to the CBS 42 report. The rodent infestation and unsanitary conditions at the Bessemer Distribution Center pose a major health and safety hazard to consumers.

10.     There are numerous dangers associated with rodents including the potential presence of Salmonella, an organism which can cause serious and sometimes fatal infections in infants, young children, frail or elderly people, pregnant persons, persons with pre-existent pathology (e.g., patients with cancer undergoing chemotherapy treatments, organ transplant recipients, etc.) and others with weakened immune systems.

11.     Dollar General had actual knowledge of the rodent infestation since at least late 2021.

12.     Dollar General knew or should have known of the rodent infestation from far earlier due to its obligation to inspect its facilities, including distribution centers, for safety and health-related issues and to maintain a clean environment of its facilities.

13.     Nevertheless, Dollar General chose to omit information about the rodent infestation and not to disclose rodent infestation to Plaintiff and the Class, so that it could continue to profit from the sale of its products.

14.    The potentially harmful consumable products at issue include: (a) human foods, snacks and beverages (groceries, perishables, canned goods, packaged dinners, condiments, herbs and spices, boxed baking mixes, beer and wine, frozen foods, candy and gum,); (b) animal foods; (c) cosmetics and personal care products (skincare products, baby oils, lipsticks, toothpaste, shampoos, feminine care, and baby wipes); (d) baby products (baby food and formula, diapers and wipes, and baby bath and skincare products),  (e) medical devices (feminine hygiene products, surgical masks, contact lens cleaning solutions, bandages, and nasal care products); (f) over-the-counter medications (pain medications, eye drops, dental products, antacids, and other medications for both children and adults) and (g) vitamins and dietary, herbal and mineral supplements (the "Adulterated Products").

15.    At no time, either before or after the Bessemer Distribution Center closing, has Dollar General alerted consumers to the potentially harmful and contaminated products, nor has Dollar General issued any type of inspection or recall of products that may be affected.

16.    During this time, Dollar General made significant profits, while knowingly exposing consumers to potentially hazardous or contaminated products by allowing and failing to prevent long-lasting and massive rodent infestations and other unsanitary conditions at its Bessemer Distribution Center. These facts demonstrate a troubling pattern of willful and intentional neglect and deceptive and

unconscionable business practices by Dollar General that compromise the health, safety, and well-being of consumers in Georgia and across the country.

17.    Despite its knowledge, Dollar General omitted information regarding the rodent infestation and unsanitary conditions from all advertising, promotion, or other contacts with Plaintiff and members of the Class prior to their purchase of products and continued to ship the products to its stores located in the southeast, including Georgia, from the Bessemer Distribution Center. By knowingly failing to disclose the rodent infestation and associated risk of contamination to consumers and by failing to correct the problem, Plaintiff and the Class purchased products of a lesser standard, grade and quality represented that do not meet ordinary and reasonable consumer expectations regarding the quality or value of the products and are unfit for their intended purpose. Moreover, the contamination associated with the rodent infestation poses a significant health risk to consumers that used or handled the products.

18.    Plaintiff brings this action on behalf of herself and all those similarly situated (the "Class," "Class Members,") for Defendant's deceptive practices in violation of the law. Plaintiff seeks damages, attorney's fees and costs, punitive damages, and the replacement of, or refund of money paid to purchase the products, and any other legal relief available for their claims. Should Plaintiff's demanded

legal relief be unavailable or prove insufficient, Plaintiff seeks appropriate equitable and injunctive relief in the alternative.

## II.   PARTIES

19.   Plaintiff Mary Jones Wright is, and at all times relevant hereto has been, a resident citizen of Albany, Georgia, located in Dougherty County, and is over the age of eighteen (18) years old.

20.   Plaintiff purchased various consumable items, including, but not limited to, human foods, cosmetics and personal care products, and over the counter medications, throughout 2022 from Dollar General located in Albany, Georgia, and claims damages as set forth below.

21.   These items Plaintiff purchased from the Dollar General in Albany, Georgia, were stored at Dollar General's Bessemer Distribution Center for a period of time prior to being delivered to Defendant's retail store to be sold.

22.   While being stored at the Bessemer Distribution Center, the items Plaintiff purchased from Dollar General came into contact with rats and became adulterated, contaminated and unsafe for human consumption and use.

23.   Plaintiff purchased, handled, and used these Adulterated Products, and due to the false and misleading claims and omissions by Defendant, Plaintiff believed the products she purchased were safe and unadulterated.

24.    Plaintiff was unaware the products she purchased from Dollar General were adulterated, contaminated by rodents and contained, or had a risk of containing, Salmonella or other infectious diseases.

25.    Plaintiff relied on Dollar General's misrepresentations that the items for sale in its store were unadulterated, safe to consume, use, and handle.

26.    Plaintiff would not have purchased any Adulterated Products from Defendant if she knew the true facts or if the rodent infestation and the related potential for contamination with Salmonella or other infectious disease had been fully and accurately disclosed and represented. Plaintiff still has no way of knowing if Defendant is still selling products that have been contaminated by exposure to rats.

27.    The Dollar General store in Albany, Georgia, is located near Plaintiff's home, and Plaintiff would continue purchasing consumable products from Defendant if the requested injunctive relief is granted and Defendant is required to disclose or otherwise issue notice to consumers regarding the Adulterated Products and recall all Adulterated Products.

28.    Defendant Dollar General Corporation is a corporation organized and existing under the laws of the state of Tennessee with its principal place of business in Goodlettsville, TN. Defendant is responsible for the manufacturing, labeling, marketing, distribution, and sale of its products to hundreds of thousands of consumers in Georgia, and millions of consumers throughout the United States. At

all times relevant hereto, Defendant conducted business in this judicial district, and continues to do so.

## III.    JURISDICTION AND VENUE

29.    This court has original jurisdiction over this civil action under the Class Action Fairness Act of 2005. The amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and there is minimal diversity because the named Plaintiff and certain members of the Class are citizens of a different state than Defendant, as required by 28 U.S.C. §1332(d)(2).

30.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in within this judicial district. Defendant conducts business in this judicial district, and its contacts here are sufficient to subject it to personal jurisdiction.

## IV.    FACTUAL ALLEGATIONS

31.    In or around late July or early August 2022, Dollar General closed its Bessemer Distribution Center due to significant rodent infestation as well as other unsanitary conditions.

32.    The closure of the Bessemer Distribution Center occurred after several Dollar General employees voiced concerns about rodents being present inside the facility, including in and on retail merchandise. An individual under the name "CollegevilleGQ" on Facebook posted three separate videos of rats in food inventory

10

and dead inside the facility during his employment at the Bessemer Distribution Center. The videos were uploaded on February 23 and 25, 2022.

33.    The photographs below were captured from these videos and were featured on CBS42/WIAT's August 8, 2022, news story:



34.    On August 8, 2022, Birmingham news station CBS42/WIAT ran a news story about the Bessemer Distribution Center closure and the rodent infestation concerns at the Bessemer Distribution Center.

35.    The rodent infestation and unsanitary conditions were never disclosed to Dollar General consumers prior to the CBS42 report.

36.    The rodent infestation and unsanitary conditions at the Bessemer Distribution Center resulted in the adulteration of products and pose a major health risk and safety hazard to consumers.

37.    Because of the rodent infestation and other unsanitary conditions at the Bessemer Distribution Center, numerous categories of products purchased by consumers from Dollar General are adulterated and unsafe for consumers to consume, use, or handle and should be discarded.

38.    The adulterated and contaminated consumable products at issue include: (a) human foods, snacks and beverages (groceries, perishables, canned goods, packaged dinners, condiments, herbs and spices, boxed baking mixes, beer and wine, frozen foods, candy and gum,); (b) animal foods; (c) cosmetics and personal care products (skincare products, baby oils, lipsticks, toothpaste, shampoos, feminine care, and baby wipes); (d) baby products (baby food and formula, diapers and wipes, and baby bath and skincare products),  (e) medical devices (feminine hygiene products, surgical masks, contact lens cleaning solutions, bandages, and nasal care products); (f) over-the-counter medications (pain medications, eye drops, dental products, antacids, and other medications for both children and adults) and (g) vitamins and dietary, herbal and mineral supplements.

39.    Dollar General is responsible for the safe, clean, and proper storage of all products in its distribution centers and the safety and quality of those products

sold in its stores. Dollar General exerts day-to-day operational control from the top down, with its national corporate entity designing, supervising, and implementing uniform policies and procedures (to the extent they exist and are followed) that govern how its distribution centers, including the Bessemer Distribution Center, and its stores operate, including the conduct at issue herein.

40.    Dollar General's method of control intentionally allowed and resulted in the massive and long-lasting rodent infestation at the Bessemer Distribution Center and the selling of thousands of dollars' worth of adulterated, potentially hazardous and contaminated products to its consumers.

41.    Defendant's consumers depend and rely upon representations by Dollar General concerning the safety and quality of its products. The pervasive and extensive rodent infestation and other unsanitary conditions at the Bessemer Distribution Center were not disclosed to Georgia consumers prior to the CBS42/WIAT report and warehouse closure, despite the significant health and safety threats to consumers.

42.    Putative class members paid millions of dollars to Dollar General for Adulterated Products impacted by its rodent infestation, and because of the multitude of health hazards and dangers associated with these products, the commercial value of these products has been stripped.

43.    Dollar General had actual knowledge of the rodent infestation since at least 2021. Dollar General knew or should have known of the rodent infestation and other unsanitary conditions far earlier, however, due to its obligation to inspect its facilities for safety, cleanliness, quality control, and health-related issues. Dollar General knew or should have known that these unsanitary conditions rendered the items at the Bessemer Distribution Center adulterated and therefore, these Adulterated Products were not suitable for sale or consumption.  Nevertheless, Dollar General chose not to disclose this information to its consumers but continued to profit from the sales of its Adulterated Products and chose not to recall any of the Adulterated Products due to the negative financial impact associated with a large-scale recall.

44.    Dollar General omitted information about the extraordinary rodent infestation and resultant product adulteration and contamination from all advertising, promotions, or other contacts with its consumers prior to the consumer's purchase of the potentially hazardous or contaminated products and continued to ship these products to its stores, including those in Georgia, from the Bessemer Distribution Center.

45.    By knowingly failing to disclose this information or correct the problems and associated risks of contamination, its consumers unknowingly purchased Adulterated Products which are of a lesser standard, grade, and quality

and failed to meet ordinary and reasonable consumer expectations regarding quality and value of products. These products were unfit for their intended purposes.

46.    Defendant's consumers purchased and continued to consume, handle, or use the adulterated, hazardous or contaminated products and were unaware that they paid too much for Adulterated Products and that these Adulterated Products could be dangerous.

47.    Consumers, including Plaintiff, would not have purchased the adulterated, hazardous or contaminated products if Dollar General had fully and accurately disclosed the adulteration of the products, the rodent infestation and the related potential for contamination with Salmonella bacteria or other infectious diseases.

48.    Consumers, including Plaintiff, relied on Dollar General's marketing, which it disseminated throughout the state, through advertising, packaging, and labeling that omitted any mention of the Adulterated Products, the rat infestation and contamination or potential contamination of goods shipped from the Bessemer Distribution Center.

49.    Plaintiff alleges that at all relevant times, including specifically at the time Plaintiff and Class Members purchased the Adulterated Products, Dollar General knew, should have known, or was reckless in not knowing of the rodent infestation; Dollar General had a duty disclose information material to a consumer,

such as the adulteration of its products and the rodent infestation, based upon its exclusive knowledge; but Dollar General never disclosed these facts to Plaintiff, Class Members, or the general public.

50.    Plaintiff makes the following allegations as specific as reasonably possible:

    a.    **Who**: *Dollar General* actively omitted information concerning the existence of Adulterated Products and the rodent infestation and unsanitary conditions from Plaintiff and Class Members at the point of sale or thereafter. Defendant's agents should have and could have disclosed these facts. As to Plaintiff, Defendant should have and could have disclosed these facts at the time Plaintiff purchased the products or thereafter.

    b.    **What**: Dollar General knew, should have known, or was reckless in not knowing, that the products were adulterate and were exposed to Salmonella and other infectious diseases due to the rodent infestation. Despite its knowledge, Dollar General *failed to disclose these facts* at the point of sale or thereafter.

    c.    **When**: Dollar General's omissions began *from the start of the Class period and continue to this day*. Dollar General has never taken any action to inform Plaintiff, Class Members, or the

general public of the true nature or extent of the Adulterated Products or the rodent infestation. As to Plaintiff, Defendant has continually omitted the true facts for the entirety of the relevant time period, including at the point of sale.

d.    **Where**: Dollar General's omissions occurred *in every communication* it had with Plaintiff, Class Members, and the general public. As to Plaintiff, Defendant's omissions occurred in every communication it had with Plaintiff about the Adulterated Products, including all communications that happened before, at the point of and after Plaintiff's purchases.

e.    **How**: Defendant *omitted and failed to disclose* the Adulterated Products and rodent infestation to Plaintiff, Class Members, or the general public at the point of sale or thereafter via a press release, a recall notice, postings at its stores, permanent warnings affixed to the products, direct mail campaign, or otherwise.  As to Plaintiff, Defendant omitted and failed to disclose these facts in any communication or point of sale document.

f.    **Why**: Due to corporate greed, Dollar General omitted information about the Adulterated Products or the rodent infestation to deceive Plaintiff, Class Members, and the general

public into buying products to *maximize its profits*. Furthering its goal to maximize profits, Dollar General failed to notify Class Members of the true nature of these facts to avoid requests to refund product purchases or to avoid its obligation to issue recall notices. As to Plaintiff and Class Members, Dollar General omitted these facts to deceive them into purchasing products, thereby maximizing Defendant's profits and to avoid refunding the cost of products to consumers.

g.    **Causation**: Because Dollar General failed to disclose any information about the Adulterated Products and the rodent infestation, despite its extensive knowledge, Plaintiff and Class Members purchased products that were of a lesser standard, grade or quality that failed to meet ordinary and reasonable consumer expectations regarding quality and value of the products and these products did not or will not safely perform as intended. As such, these adulterated, contaminated and potentially hazardous products are worth less than those products of uncontaminated standard, grade or quality and ones that are safe to use and handle. Had Defendant disclosed these facts,

> *Plaintiff and other Class Members would not have purchased the*
>
> *products, or certainly would have paid less for the products.*

51.     Earlier this year, Dollar General's primary competitor, Family Dollar, closed over 400 retail stores and issued a voluntary recall of retail products as a result of similar massive rodent infestation and unsanitary conditions at Family Dollar's West Memphis Distribution Center. In contrast to the closure of retail stores, affirmative notice to consumers, and a voluntary recall of products disseminating out of the West Memphis Distribution Center, Dollar General has taken **no** actions to inform the public, close or inspect affected retail stores, or recall any adulterated, contaminated or potentially contaminated retail products that may be in the hands of consumers and pose a significant health and safety risk.

## V.     <u>CLASS ACTION ALLEGATIONS</u>

52.     Plaintiff brings this nationwide class action on behalf of herself and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

53.     The Nationwide Class that Plaintiff seeks to represent is defined as follows:

> All individuals or entities residing in the United States who, during the four years preceding the filing of this class action complaint, purchased consumable products including: (a) human foods, snacks and beverages; (b) animal foods; (c) cosmetics and personal care products; (d) baby products,  (e) medical devices; (f) over-the-

counter medications and (g) vitamins and dietary, herbal and mineral supplements from Dollar General stores located in the United States which were supplied by the Bessemer Distribution Center.

54.     Alternatively, or in addition to the Nationwide Class claims, Plaintiff brings these claims individually and on behalf of a subclass of individuals and entities residing in the State of Georgia. The Georgia Subclass is defined as follows:

All individuals or entities residing in the State of Georgia who, during the four years preceding the filing of this class action complaint, purchased consumable products including: (a) human foods, snacks and beverages; (b) animal foods; (c) cosmetics and personal care products; (d) baby products,  (e) medical devices; (f) over-the-counter medications and (g) vitamins and dietary, herbal and mineral supplements from Dollar General stores located in Georgia and were supplied by the Bessemer Distribution Center.

55.     Collectively, the Nationwide Class and the Georgia Subclass are referred to herein as the "Class" or "Classes."

56.     Excluded from the Class are Defendant, its employees, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliates of Defendant, Class Counsel and their employees, and the judicial officers and their immediate family members and court staff assigned to this case.

57.     Plaintiff reserves the right to amend or otherwise alter the Class definitions presented to the Court at the appropriate time, or to propose additional or

alternate subclasses, in response to facts learned through discovery, legal arguments advanced by Defendant, or otherwise.

58.    <u>Numerosity— Fed. R. Civ. P. 23(a)(1).</u> The Class is comprised of thousands of individuals who were Defendant's customers, the joinder of which in one action would be impracticable. The exact number or identification of the Class Members is presently unknown. The identity of the Class Members is ascertainable and can be determined based on Defendant's business records.

59.    <u>Predominance of Common Questions— Fed. R. Civ. P. 23(a)(2) and (b)(3).</u> The questions of law and fact common to the Class predominate over questions affecting only individual Class Members, and include, but are not limited to, the following:

a.    Whether Defendant engaged in the unlawful conduct alleged herein;

b.    whether Defendant owed a duty of care to Plaintiff and Class Members;

c.    whether Defendant represented in advertising, marketing, storing, distributing, and/or selling were unlawful, false, deceptive, and/or misleading;

d.    whether Defendant mislead Plaintiff and Class Members about its unlawful sales;

e.      whether Defendant's representations deceived Plaintiff and Class Members;

f.      whether Defendant knew or should have known that its products were adulterated;

g.      whether Defendant knew or should have known that the rodent infestation existed;

h.      whether Defendant knew or should have known that the rodent infestation posed health and safety risks to consumers;

i.      whether Defendant failed to disclose the rodent infestation;

j.      whether Defendant failed to disclose that it was selling Adulterated Products;

whether Defendant's representations in advertising, marketing, storing, distributing, selling, warranties, packaging, and/or labeling were unlawful, false, deceptive, and/or misleading;

k.      whether those representations deceived Plaintiff and Class Members;

l.      whether Defendant had knowledge that those representations were false, deceptive, and misleading;

m.      whether Defendant continues to disseminate those representations despite knowledge that the representations are

false, deceptive, and misleading;

n.    whether Defendant's failure to notify and disclose the rodent

infestation or its sale of Adulterated Products is material to a

reasonable consumer;

o.    whether Defendant's marketing and advertising of the products

are likely to mislead, deceive, confuse, and/or confound

consumers acting reasonably;

p.    whether Defendant violated federal laws or Georgia law;

q.    where Defendant was required to institute a recall; and

r.    whether Plaintiff and the members of the Class are entitled to

declaratory and injunctive relief.

60.    Defendant engaged in a common course of conduct giving rise to the

legal rights sought to be enforced by Plaintiff individually and on behalf of the other

members of the Class. Identical statutory violations and business practices and harms

are involved. Individual questions, if any, are not prevalent in comparison to the

numerous common questions that dominate this action.

61.    Typicality—Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of

those of the members of the Class in that they are based on the same underlying

facts, events, and circumstances relating to Defendant's conduct. Plaintiff is

advancing the same claims and legal theories individually and on behalf of all

members of the Class. Further, there are no defenses available to Defendant that are unique to Plaintiff or to any particular Class Members.

62.    <u>Adequacy— Fed. R. Civ. P. 23(a)(4); (g)(1).</u> Plaintiff will fairly and adequately represent and protect the interests of the Class, has no interest incompatible with the interests of the Class, and has retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

63.    <u>Predominance — Fed. R. Civ. P. 23(b)(3).</u> Questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class.

64.    <u>Superiority and Manageability— Fed. R. Civ. P. 23(b)(3):</u> A class action is the best available method for the efficient adjudication of this litigation because individual litigation of Class Members' claims would be impracticable and individual litigation would be unduly burdensome to the courts. Plaintiff and members of the Class have suffered irreparable harm as a result of Defendant's bad faith, fraudulent, deceitful, unconscionable, unlawful, and unfair conduct.  Because of the size of the individual Class Members' claims, no Class Member could afford to seek legal redress for the wrongs identified in this Complaint. Without the class action vehicle, the Class would have no reasonable remedy and would continue to suffer losses, as Defendant continues to engage in the bad faith, fraudulent, deceitful, unconscionable, unlawful, and unfair conduct that is the subject of this Complaint,

and Defendant would be permitted to retain the proceeds of its violations of law. Further, individual litigation has the potential to result in inconsistent or contradictory judgments. A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## VI.    TOLLING OF STATUTES OF LIMITATIONS

**65.**    Discovery Rule:  Plaintiff's and Class members' claims accrued upon discovery that Defendant's Bessemer Distribution Center was rodent infested and unsanitary. While Defendant knew, and concealed, these facts, Plaintiff and the Class could not and did not discover these facts through reasonable diligent investigation until within the applicable statute of limitations period.

66.    Active Concealment Tolling:  Any statutes of limitations are tolled by Defendant's knowing and active concealment of the facts set forth above.  Defendant kept Plaintiff and all members of the Class ignorant of vital information essential to the pursuit of their claim, without any fault or lack of diligence on the part of Plaintiff.  The details of Defendant's efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiff and the Class, and await discovery.  Plaintiff could not have reasonably discovered these facts, nor that Defendant failed to disclose material facts concerning its performance.

67.    <u>Estoppel:</u> Defendant is and was under a continuous duty to disclose to Plaintiff and all members of the Class the true character, quality, and nature of the Adulterated Products. At all relevant times, and continuing to this day, Defendant knowingly, affirmatively, and actively concealed the true character, quality, and nature of the Adulterated Products.  The details of Defendant's efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiff and the Class, and await discovery.  Plaintiff reasonably relied on Defendant's active concealment.  Based on the foregoing, Defendant is estopped from relying on any statutes of limitation in defense of this action.

68.    <u>Equitable Tolling:</u> Defendant took active steps to conceal and misrepresent material facts relating to the rodent infestation and its sale of Adulterated Products. The details of Defendant's efforts are in its possession, custody, and control, to the exclusion of Plaintiff and the Class, and await discovery. When Plaintiff learned about this material information, she exercised due diligence by thoroughly investigating the situation, retaining counsel, and pursuing her claims. Should such tolling be necessary, therefore, all applicable statutes of limitation are tolled under the doctrine of equitable tolling.

## VII.   <u>CAUSES OF ACTION</u>

### <u>COUNT I</u>
### NEGLIGENCE
### (on behalf of the Nationwide Class)

69.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 68 above.

70.    At all times relevant herein, Defendant owed a duty to Plaintiff and Class members to exercise reasonable care in the marketing, quality control, storage, distribution, and selling of the Adulterated Products, including a duty to follow FDCA requirements by safely storing the Products in a sanitary manner, and by not selling the Adulterated Products.

71.    Defendant also owed a duty to Plaintiff and Class members not to unlawfully sell the Products that were unsafe for human use or consumption and defective.

72.    Defendant also owed a duty to Plaintiff and Class members to advise them of their right to a refund due to Defendant's sales of Adulterated Products.

73.    Defendant breached its duties to Plaintiff and Class members by (a) storing the Products in unsafe and unsanitary conditions; (b) unlawfully selling the Products that were not safe for human use or consumption; (c) marketing, storing, distributing, selling, and warranting Products which did not meet safety standards and were of a lesser quality, purity, and effectiveness than was represented to Plaintiff and Class members; (d) failing to take those steps necessary to discontinue storing and/or selling the Adulterated Products to consumers, and (e) failing to institute a recall for the Adulterated Products.

74.    Despite the ability and means of the Defendant to properly store, distribute, and sell products that met FDCA requirements as to safety, quality, purity, and effectiveness; Defendant failed to do so.

75.    When Plaintiff and Class members purchased the Adulterated Products, they were unaware that the Products could not lawfully be sold and were therefore unsafe for human use or consumption and lacked the quality, purity, and effectiveness as were marketed by Defendant.

76.    After their purchase, and following the investigation into Defendant's unsanitary warehouse conditions, Plaintiff and Class members were unaware of the unsanitary nature of the Products due to Defendant's failure to institute a recall.

77.    As a direct and proximate cause of the foregoing, Plaintiff and Class members have suffered, and will continue to suffer, damages and economic loss as described herein.

78.    Plaintiff and the Class members are entitled to damages in an amount to be determined at trial.

## COUNT II
## NEGLIGENCE *PER SE*
### (on behalf of the Nationwide Class)

79.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 78 above.

80.     Defendant owed a duty to Plaintiff and Class members to abide by all applicable federal and state statutes, laws, and regulations regarding regulated products.

81.     Defendant had a duty to comply with 21 U.S.C. § 331, *et seq.*, which prohibits the introduction of adulterated products into interstate commerce. *See* FDCA, 21 U.S.C. § 331.

82.     In particular, the FDA-regulated products held by Defendant at its Bessemer warehouse and distribution center were adulterated through Defendant's failure to maintain sanitary conditions, introducing them into interstate commerce, and selling the Adulterated Products in violation of 21 U.S.C. § 331, *et seq*. *See* 21 U.S.C. § 351.

83.     Additionally, Defendant violated each States' respective consumer protection statute by, among other things: 1) willfully concealing that the affected Products were stored in unsanitary conditions; 2) willfully selling Products that could not lawfully be sold and were therefore unsafe for human use and consumption; 3) failing to disclose and actively concealing that the Products could not lawfully be sold and did not meet requirements as to safety, quality, purity, and effectiveness; 4) representing that the Products had characteristics, uses, benefits, and qualities which they did not have; 5) representing that the Products are of a particular standard, quality and grade when they were not; 6) intentionally and knowingly

misrepresenting material facts regarding the Products; and (7) failing to institute a recall.

84.    The fact that Defendant failed to comply with FDCA requirements, and similar state statutes regarding product safety, quality, purity, and effectiveness is evidence that Defendant breached their duty of reasonable care and is negligence *per se*.

85.    Plaintiff and Class members were in the class of people intended to be protected by these statutes regarding product safety. Defendant's failure to comply with these statutes was a direct and proximate cause of Plaintiff's and Class members' injuries and damages.

86.    Plaintiff and Class members suffered injury and damages as a direct and proximate result of Defendant's acts and omissions constituting negligence *per se*.

## COUNT III
### NEGLIGENT FAILURE TO WARN
### (on behalf of the Georgia Subclass)

87.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 86 above.

88.    Defendant, as the seller of the Adulterated Products, had a duty to

Plaintiff and the Georgia Subclass to exercise the same degree of care, diligence, and skill to adequately warn and/or instruct them that the Adulterated

Products could not lawfully be sold, were unsafe for human use or consumption, did not meet requirements as identity, strength, quality, purity, and effectiveness, and were not fit for their intended purpose as other sellers would have exercised.

89.    Defendant negligently failed to warn that the Products could not lawfully be sold, were unsafe for human use or consumption, did not meet requirements as to quality, purity, and effectiveness, and were not fit for their intended purpose. Specifically, the improper and unsanitary storage practices, unlawful sales, and safety risks to Plaintiff and Subclass members. Such negligent conduct was a proximate cause of injuries sustained by Plaintiff and the Subclass.

90.    Defendant was in a position superior to that of Plaintiff and the Subclass to be aware of the unsanitary conditions of its warehouse and distribution center and the qualities of the Adulterated Products, as set forth herein. Thus, Defendant had an obligation to inform Plaintiff and the Subclass of its improper and unsanitary storage practices and unlawful sales practices. Further, Defendant had a superior opportunity to inspect its Bessemer warehouse and distribution center and become aware of the improper and unsanitary storage practices over and above Plaintiff and the Subclass.

91.    The absence of adequate warnings and instructions caused injury-in-fact and damages to Plaintiff and the Subclass that the Defendant knew or should have known about in the exercise of ordinary care. Defendant breached said duty, and negligently failed to warn Plaintiff and the Subclass of the improper and

unsanitary storage practices and unlawful sales practices.

92.    Plaintiff and the Subclass members would not have purchased the Products had they known the truth about the unlawful sale of the Products and that the Products were unsafe for human use or consumption and were defective.

93.    As a direct and proximate cause of the foregoing, Plaintiff and the Subclass members have suffered and will continue to suffer damages.

## COUNT IV
## NEGLIGENT MISREPRESENTATION
### (on behalf of the Georgia Subclass)

94.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 93 above.

95.    The acts and omissions of Defendant described herein were done with conscious disregard of the rights of Plaintiff and Subclass members.

96.    These representations were material at the time they were made. They concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to purchase the Products.

97.    Defendant made identical misrepresentations and omissions to members of the class regarding the Products. Defendant should have known their representations to be false and had no reasonable grounds for believing them to be true when they were made.

98.    By and through such negligent misrepresentations, Defendant intended to induce Plaintiff and those similarly situated to purchase the Products.

99.    Plaintiff and those similarly situated relied to their detriment on Defendant's negligent misrepresentations. Had Plaintiff and those similarly situated been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation, not purchasing (or paying less for) the Products.

100.    Plaintiff and the Subclass members have suffered economic damages.  In particular, Plaintiff seeks to recover on behalf of herself and the Subclass members the full price paid for the worthless Products.

**COUNT V**
**UNJUST ENRICHMENT**
**(on behalf of the Nationwide Class)**

101.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 100 above.

102.    As a result of Defendant's wrongful and deceptive conduct alleged herein, Defendant knowingly and voluntarily accepted and retained wrongful benefits in the form of money paid by the Plaintiff and members of the Class when they purchased the Adulterated Products.

103.    In so doing, Defendant acted with conscious disregard for the rights of Plaintiff and members of the Class.

104.    As a result, Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the Class.

105.    Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

106.    Defendant either knew or should have known that the payments rendered by Plaintiff and Class members were given and received with the expectation that the Adulterated Products would have the qualities, characteristics, and suitability for use represented by Defendant and that ordinarily pass in the trade.

107.    As such, it would be inequitable for Defendant to retain the benefit of the payments from Plaintiff and Class Members under these circumstances.

108.    The financial benefits derived by Defendant from obtaining and retaining Plaintiff's property rightfully belongs to Plaintiff and members of the Class.

109.    Defendant failed to institute a recall with deprived customers of their rights to a refund, thereby allowing Defendant to retain the profits of its ill-gotten gains.

110.    Defendant's acceptance and retention of these benefits under the circumstances alleged herein make it inequitable for Defendant to retain the benefits without payment of the value to Plaintiff and Class members.

111.   Plaintiff and Class members are entitled to recover from Defendant all amounts wrongfully collected and improperly retained by Defendant, plus interest thereon.

**COUNT VI**
**MAGNUSON-MOSS WARRANTY ACT (15 U.S.C. § 2301)**
**(on behalf of the Nationwide Class)**

112.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 111 above.

113.   "This Court has jurisdiction to decide claims brought under 15 U.S.C.§ 2301 by virtue of 28 U.S.C. § 1332(a)-(d)."

114.   The Adulterated Products are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). The Plaintiff and Class members are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

115.   Each Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

116.   15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

117.   There was a sale of goods from Defendant to Plaintiff and Class members.

118.  As set forth herein, Defendant marketed, distributed, and sold the Adulterated Products, and prior to the time the Adulterated Products were purchased by Plaintiff and Class members, Defendant impliedly warranted to them that they were of merchantable quality, fit for their ordinary use, and conformed to the promises and affirmations of fact made on the Adulterated Products' packages and labels, which they did not.

119.  Plaintiff and Class members relied on Defendant's promises and affirmations of fact.

120.  Contrary to these representations and warranties, the Adulterated Products were not fit for their ordinary use and did not conform to Defendant's representations.

121.  Defendant breached the implied warranties by knowingly selling to Plaintiff and Class members products that did not meet requirements as to safety, quality, purity, and effectiveness and were not fit for their intended purpose.

122.  Defendant was on notice of this breach, as it was aware the Adulterated Products were not stored within proper and sanitary conditions and did not meet requirements as to safety, quality, purity, and effectiveness.

123.  Plaintiff and Class members are the intended beneficiaries of Defendant's implied warranties and Plaintiff and Class members did not alter the Adulterated Products.

124.   As a direct and proximate result of Defendant's conduct, Plaintiff and Class members have suffered actual damages in that they purchased the Adulterated Products that are worthless or worth less than the price they paid and that they would not have purchased any of the products had they known the actual quality of the Adulterated Products.

**COUNT VII**
**BREACH OF IMPLIED WARRANTY**
**(on behalf of the Nationwide Class)**

125.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 124 above.

126.   Defendant is and was at all relevant times a "merchant" with respect to consumer goods (under O.C.G.A. § 11-2-104(1) (2022) and a "seller[]" of consumer goods (under O.C.G.A. § 11-2-103(1)(d) (2022) and similar laws in other states).

127.   The Adulterated Products purchased by Plaintiff and Class Members are and were at all relevant times "goods" within the meaning of O.C.G.A. § 11-2-105(1) (2022), O.C.G.A. § 11-2A-103(1)(h) (2022) and similar laws in other states).

128.   There was a sale of goods from Defendant to Plaintiff and Class members.

129.   As set forth herein, Defendant marketed, distributed, and sold the Adulterated Products, and prior to the time the Adulterated Products were purchased by Plaintiff and Class members, Defendant impliedly warranted to them that they

were of merchantable quality, fit for their ordinary use, and conformed to the promises and affirmations of fact made on the Adulterated Products' packages and labels, which they did not.

130.    Plaintiff and Class members relied on Defendant's promises and affirmations of fact.

131.    Contrary to these representations and warranties, the Adulterated Products were not fit for their ordinary use and did not conform to Defendant's representations.

132.    Defendant breached the implied warranties by knowingly selling to Plaintiff and Class members products that did not meet requirements as to safety, quality, purity, and effectiveness and were not fit for their intended purpose.

133.    Defendant was on notice of this breach, as it was aware the Adulterated Products were not stored within proper and sanitary conditions and did not meet requirements as to safety, quality, purity, and effectiveness.

134.    Plaintiff and Class members are the intended beneficiaries of Defendant's implied warranties and Plaintiff and Class members did not alter the Adulterated Products.

135.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class members have suffered actual damages in that they purchased the Adulterated Products that are worthless or worth less than the price they paid and that they would

not have purchased any of the products had they known the actual quality of the

Adulterated Products.

<u>**COUNT VIII**</u>
**VIOLATION OF GEORGIA'S FAIR BUSINESS PRACTICES ACT**
**(O.C.G.A. § 10-1-390, *et seq.* (2022))**
**(on behalf of the Georgia Subclass)**

136.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through

135 above.

137.   The Georgia Fair Business Practices Act ("Georgia FBPA") declares

"[u]nfair or deceptive acts or practices in the conduct of consumer transactions and

consumer acts or practices in trade or commerce" to be unlawful, O.G.C.A. § 10-1-

393(a) (2022), including, but not limited to, "representing that goods or services

have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities

that they do not have," "[r]epresenting that goods or services are of a particular

standard, quality, or grade . . . if they are of another," and "[a]dvertising goods or

services with intent not to sell them as advertised." O.G.C.A. § 10-1-393(b) (2022).

138.   Plaintiff and the Subclass members are "consumers" within the

meaning of O.G.C.A. § 10-1-393(b) (2022).

139.   At all relevant times, Defendant engaged in "trade or commerce" within

the meaning of O.G.C.A. § 10-1-393(b) (2022).

140.   Defendant's omissions and practices described herein were likely to,

and did in fact, deceive and mislead members of the public, including Plaintiff and

the members of the Georgia Subclass, acting reasonably under the circumstances, to their detriment by failing to reveal the truth about improper and unsanitary storage practices and/or safety and quality issues; Defendant thus violated the Georgia FBPA.

141.   Defendant owed Plaintiff and the Subclass members a duty to disclose the truth about the safety, quality, purity, and effectiveness of the Adulterated Products because Defendant:

a.     Possessed exclusive knowledge of the condition of the Adulterated Products;

b.     Intentionally concealed the foregoing from the Georgia Subclass members; and/or

c.     Made incomplete representations about the safety, quality, purity, and effectiveness of the Adulterated Products, while purposefully withholding material facts from the Georgia Subclass members that contradicted these representations.

142.   Defendant failed to reveal facts that were material to Plaintiff and the members of the Subclass's decisions to purchase the Products, and Defendant intended that Plaintiff and the members of the Subclass would rely upon the omissions.

143.   In addition, Defendant failed to institute a recall or adequately advise Plaintiff and members of the Subclass of their right to a refund.

144.   For example, in the course of Defendant's business, Defendant concealed and suppressed material facts, including that the Products were stored in improper and unsanitary conditions, and that they did not meet requirements as to safety, quality, purity, and effectiveness.

145.   Defendant repeatedly advertised, both on the Product labels and on its website, through a national advertising campaign, among other items, that the Products met requirements as to safety, quality, purity, and effectiveness.

146.   Yet, as demonstrated herein, Defendant engaged in a pattern of unsafe and unsanitary holding practices of its Products. Thus, Defendant knew or should have known that its Products were held in a manner which do not meet ordinary and reasonable consumer expectations and were unfit for use.

147.   Plaintiff and the members of the Subclass were deceived by Defendant's claims.

148.   Defendant's actions impact the public interest because Plaintiff and the members of the Georgia Class were injured in exactly the same way as thousands of others purchasing Products as a result of and pursuant to Defendant's generalized course of deception.

149.   As a direct and proximate result of Defendant's violations of the Georgia FBPA, Plaintiff and the Subclass members have suffered injury-in-fact and/or actual damages.

150.   Plaintiff and the Subclass members are entitled to recover damages and exemplary damages (for intentional violations) per O.G.C.A. § 10-1-399(a) (2022).

151.   Plaintiff and the Subclass members also seek an order enjoining Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia FBPA per O.G.C.A. § 10-1-399 (2022).

152.   Plaintiff files the instant complaint for notice purposes and to allege additional claims, and reserve the right to amend this count if Defendant do not remedy or rectify Plaintiff's injuries as alleged herein within the statutory period.

153.   Accordingly, Defendant is liable to Plaintiff and the other Subclass members for damages in an amount to be proven at trial.

## COUNT IX
## VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT (O.G.C.A. § 10-1-370, *et seq.* (2022)) (on behalf of the Georgia Subclass)

154.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 153 above.

155.   This claim is brought on behalf of Plaintiff and the Subclass members.

156.   Georgia's Uniform Deceptive Trade Practices Act (Georgia UDTPA) prohibits "deceptive trade practices," which include "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have"; "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another"; and "[a]dvertising goods or services with intent not to sell them as advertised." O.G.C.A. § 10-1- 393(b) (2022).

157.   Defendant, Plaintiff and the Georgia Subclass members are "persons" within the meaning of O.G.C.A. § 10-1-371(5) (2022).

158.   Plaintiff and the Georgia Subclass seek an order enjoining Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under O.G.C.A. § 10-1-373 (2022).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this case be certified and maintained as a class action and for a judgment to be entered upon Defendant as follows:

A.   certify the Class or Classes as proposed herein, designating Plaintiff as Class representative, and appointing undersigned counsel as Class Counsel;

B.   award economic and compensatory damages on behalf of Plaintiff and all Class members;

C.   award   all   actual,   general,   special,   incidental,   punitive,   and

consequential damages to which Plaintiff and Class members are entitled;

      D.    award treble damages pursuant to law, and all other actual, general, special, incidental, statutory, punitive, and consequential damages to which Plaintiff and Class members are entitled;

      E.    order injunctive relief, compelling Defendant to cease their unlawful actions and to account to Plaintiff for their unjust enrichment;

      F.    award reasonable attorneys' fees, reimbursement of all costs for the prosecution of this action, and pre-judgment and post-judgment interest; and

      G.    grant such other and further relief this Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all causes of action so triable.

Dated: May 3, 2024             Respectfully submitted,

                         */s/ Brent Irby*
                         R. Brent Irby (GA Bar No. 224232)
                         **IRBY LAW, LLC**
                         2201 Arlington Avenue South
                         Birmingham, Alabama 35205
                         Tel: (205) 936-8281
                         Email: brent@irbylaw.net

                         *Attorney for Plaintiff and the*
                         *Proposed Classes*

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 3, 2024, a true and correct copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will provide notification to all counsel of record.

/s/ Brent Irby
R. Brent Irby